**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| WARREN GREEN, | ) | CASE NO. 5:16-cv-2538 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE DAVID A. RUIZ |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| *Acting Comm'r of Social Security,* | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |

Plaintiff, Warren Green (hereinafter "Plaintiff"), challenges the final decision of

Defendant Nancy A. Berryhill, Acting Commissioner of Social Security (hereinafter

"Commissioner"), denying his applications for a Period of Disability ("POD"), Disability

Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI

of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq*. ("Act"). This court has

jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States

Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation. For the reasons set forth below, the Magistrate Judge recommends that the

Commissioner's final decision be AFFIRMED.

## I.   Procedural History

On January 24, 2014, and February 14, 2014, Plaintiff filed his applications for POD, DIB, and SSI, alleging a disability onset date of October 31, 2012. (Transcript ("Tr.") 204-216). The application was denied initially and upon reconsideration, and Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 140-146, 149-164). Plaintiff participated in the hearing on September 29, 2015, was represented by counsel, and testified. (Tr. 16-83). A vocational expert ("VE") also participated and testified. *Id*. On October 27, 2015, the ALJ found Plaintiff not disabled. (Tr. 30). On September 9, 2016, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision. (Tr. 1-3). On October 18, 2016, Plaintiff filed a complaint challenging the Commissioner's final decision. (R. 1). The parties have completed briefing in this case. (R. 13, 15 & 16).

Plaintiff asserts the following assignments of error: (1) the ALJ failed to properly evaluate his neurofibromatosis and psychiatric impairments at step three of the sequential evaluation; (2) the ALJ did not properly evaluate his credibility and (3) the ALJ failed to meet his burden at Step Five of the sequential evaluation. (R. 13).

## II. Evidence

### A. Personal and Vocational Evidence

Plaintiff was born in 1974 and was 38-years-old on the alleged disability onset date. (Tr. 29). He had a high school education and was able to communicate in English. (Tr. 29). He had past relevant work as a food sales clerk, furniture rental consultant, and furniture assembler-installer. (Tr. 28-29).

2

**B. Relevant Medical Evidence**[1]

    **1.   Treatment Records**

        **a. Physical Impairments**

Plaintiff was diagnosed with neurofibromatosis, type 1, as a child, but never received any specific treatment. (Tr. 289, 364). On March 27, 2008, Dariush Saghafi, M.D., noted that "patient is in no acute distress," that he had "multiple fibrous nodular lesions on his arms, back, and torso," which were "nontender except those over the 'tailbone' which are painful to deep pressure." (Tr. 290). With respect to gait, there was no antalgia, Plaintiff had no predisposition to falls, and he was able to toe and heel walk. (Tr. 291).

On March 29, 2008, an x-ray of the lumbosacral spine was normal save for "minimal dorsolumbar scoliosis convex to the right." (Tr. 298).

On July 25, 2013, Plaintiff complained of swelling and pain in his feet and legs. (Tr. 300). The nurse noted edema was "absent" in the extremities upon physical evaluation, but included edema in her assessment, as well as neurofibromatosis, chest pain, arthralgia, and headache. (Tr. 300).

On December 18, 2014, an MRI of Plaintiff's lumbar spine was performed and compared to an earlier MRI dated January 5, 2012. (Tr. 440-441). Laura L. Novak, M.D.'s impression was dural ectasia of the lumbosacral canal, similar to the prior examination, which was likely related to Plaintiff's history of neurofibromatosis. (Tr. 441).

On January 15, 2015, an x-ray of the lumbar spine revealed "[m]inimal degenerative change

---

[1] The recitation of the evidence is not intended to be exhaustive. It includes only those portions of the record cited by the parties in their briefs *and* deemed relevant by the court to the assignments of error raised.

3

of the lumbosacral junction with the space narrowing and facet degenerative changes noted." (Tr. 429).

On February 11, 2015, Plaintiff complained of pain in the lumbar region extending to the left lower extremity (calf) and occasionally to the foot, and numbness and tingling of his left lower extremity. (Tr. 535). Kanubhai Patel, M.D., diagnosed low back pain, lumbar radiculopathy in the left lower extremity, and neurofibromatosis. (Tr. 536). Plaintiff was able to walk with a guarded gait, had no tenderness in the neck, extreme stiffness in the paralumbar musculature, soreness/stiffness over both paralumbar regions, and limited lumbar spine movement due to pain. *Id*. His knee and ankle reflexes were normal, and he had no new leg edema. *Id*.

On April 8, 2015, Kenneth Sykes, M.D., noted that Plaintiff had been evaluated by a neurosurgeon and was told that he has a lesion that is surgically correctable at this point. (Tr. 531). Plaintiff continued with a physical therapist and the TENS, which has been very helpful for him. *Id*. Plaintiff complained that he started experiencing extreme pain in his lower back radiating down the left lower extremity about seven months earlier. *Id*. Plaintiff's medications "allow him to function and have an improvement in his quality of life," without adverse side effects. *Id*. On exam, Plaintiff rated his pain 8 of 10, had a slightly antalgic gait, diminished heel and toe walking, decreased range of motion in the lumbar spine, positive paraspinal muscle spasms, positive straight leg raising, tenderness over the bilateral sacroiliac regions, and deep tendon reflexes were mildly decreased. *Id*.

On April 10, 2015, notes from NeuroCare Center indicate Plaintiff was positive for fever, weight gain, dysphagia, vision changes, cough, snoring, chest pain, irregular heartbeat and palpations, nausea, vomiting, urinary incontinence, dizziness, extremity weakness, gait

disturbance, headache, memory impairment, numbness in extremity, anxiety, depression, insomnia, back pain, joint pain, and muscle weakness.[2] (Tr. 587).

On June 15, 2015, Taslima M. Shaikh, M.D., diagnosed neurofibromatosis, chronic back pain, and edema. (Tr. 592).

On July 6, 2015, Matthew B. Jones, M.D., saw Plaintiff at Comprehensive Pain Management Specialists. (Tr. 578-583). Plaintiff stated that physical therapy and the TENS unit yielded no relief. (Tr. 578). Plaintiff had an antalgic gait with dragging of the left foot. (Tr. 581). In the lumbar spine, Plaintiff had "tenderness paravertebral muscles on the left, tender low sacral midline[,] [t]ender on neurofibroma low sacral midline[,] [p]ain with left facet loading[,] [and] [l]eft upper sacrum tender." (Tr. 580).

On August 3, 2015, Dr. Jones assessed Plaintiff with neurofibromatosis Type 1 (von Recklinghausen's disease), lumbago, radiculopathy lumbar/thoracic, myofascial or muscle pain, lumbar without myelopathy (osteoarthritis), and neck pain/cervicalgia. (Tr. 571-573). On examination, Plaintiff had presented with left leg pain with tenderness and spasms in the calf musculature and neuropathic pains that radiate from the back. (Tr. 572). Dr. Jones questioned whether Plaintiff may have a medial calf neurofibroma, though he did not feel a mass in Plaintiff's leg. *Id*.

### b. Mental Impairments

On July 25, 2013, a nurse assessed Plaintiff with depression not otherwise specified. (Tr. 300).

---

[2] It is unclear from the notes whether the aforementioned symptoms are the result of objective medical testing or merely Plaintiff's self-reports. The document is not signed by any medical source. (Tr. 585-589).

On March 17, 2014, Plaintiff was seen at Portage Path Behavioral Health complaining of mood swings after a recent break up of a relationship and eviction from his apartment. (Tr. 355-359). He reported feeling down, negative thinking, anxiousness, nervousness, crying episodes once or twice a week, and cutting himself with a razor or box cutter. (Tr. 355). On mental status examination, he was poorly groomed, avoided eye contact, had clear speech, no delusions or hallucinations, a depressed mood, a constricted/blunted effect, he was oriented x 4, had fair insight, fair judgment, and logical thought. (Tr. 357). He was ascribed a Global Assessment of Functioning ("GAF") Score of 58, indicative of moderate symptoms.[3]  (Tr. 358).

On May 20, 2014, Plaintiff was seen at Portage Path Behavioral Health for medication management. (Tr. 380). On mental status examination, he was well groomed, made average eye contact, had clear speech, no delusions or hallucinations, an irritable mood, a full effect, he was cooperative and oriented x 4, had good insight, good judgment, and racing thought. (Tr. 380).

On June 5, 2014, treatment notes from Portage Path Behavioral Health indicate no significant changes in mental status, but noted that Plaintiff's affect was appropriate, his mood was depressed/anxious, his insight was fair, his judgment was fair, and his thought was logical. (Tr. 378).

On July 22, 2014, treatment notes from Portage Path Behavioral Health indicate no

---

3  The GAF scale reports a clinician's assessment of an individual's overall level of functioning. *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (American Psychiatric Ass'n, 4th ed. revised, 2000) ("DSM-IV"). An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments. A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *See* DSM IV at 34. An update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

significant changes in mental status, but noted that Plaintiff's affect was appropriate, his mood was depressed, his insight and judgment were fair, and his thought was dichotomous. (Tr. 377).

On August 4, 2014, Plaintiff was again seen at Portage Path Behavioral Health reporting that he had shoplifted two months earlier, which he believed was caused by his medications. (Tr. 375). He further reported a worsening of his mood and anxiety symptoms. *Id*. Plaintiff reported cutting himself, the treatment provider described "very superficial 20 cut marks on his left upper thigh." *Id*. On mental status examination, he was adequately groomed, made average eye contact, had clear speech, no delusions or hallucinations, an anxious and depressed mood, a full effect, he was cooperative and oriented x 4, had fair insight, poor judgment, and logical thought. *Id*.

On September 8, 2014, treatment notes from Portage Path Behavioral Health indicate that Plaintiff reported a "huge difference" with his depression since he started the medication Fetzima six weeks earlier. (Tr. 405). He still reported "some anxiety issues and panic attacks." *Id*. On mental status examination, he was poorly groomed, had clear speech, no delusions/hallucinations or paranoia, a euthymic mood, a full effect, he was cooperative and oriented x 4, had good insight, good judgment, and logical thought. *Id*.

On February 5, 2015, Plaintiff was seen at Coleman Psychiatry by Heather Lewis. (Tr. 563-568). He was described as obese, disheveled, and malodorous. (Tr. 564). On mental status examination, his demeanor/behavior was cooperative, he made fair eye contact, his affect was constricted, his thought process logical, and cognitive impairment was "unremarkable." (Tr. 565).

On April 2, 2015, treatment notes from Coleman Psychiatry indicate Plaintiff was ascribed a GAF score of 50. (Tr. 557-560).

### 2.  Medical Opinions

#### a. Physical Functional Limitations

On March 26, 2014, Chimezie C. Amamambu, M.D., examined Plaintiff in connection with his disability application. (Tr. 364-366). On physical examination, Plaintiff was well-kempt, cooperative, and in no acute distress. (Tr. 365). Plaintiff's breathing was normal with no rales or wheezes, his abdomen was soft and non-tender, bowel sounds were normal, and heart sounds were normal with no murmur. *Id*. Plaintiff had sebaceous cysts and nodules on his back, there was no tenderness on palpation of the spinal processes and paraspinal muscles, and straight leg raising was negative in both the sitting and lying position. *Id*. Plaintiff had a non-tender circular nodule on his right wrist, normal arterial pulses, and no edema. *Id*. Plaintiff's sensation was intact and he had a normal gait. *Id*. Based on his examination, Dr. Amamambu concluded that Plaintiff's "physical exam was normal except for the neurofibromatosis," but there was "no evidence that his pain that he feels is related to the neurofibromatosis" (Tr. 365). Dr. Amamambu opined that Plaintiff could stand, walk, kneel, bend, twist, crawl, carry, lift and reach and could perform light work (lift 20 pounds and stand for six hours). (Tr. 366). On the same date, Dr. Amamambu conducted manual muscle testing, which revealed that Plaintiff had normal (5/5) strength and range of motion in all areas. (Tr. 360-363).

On April 2, 2014, State Agency physician Gary Hinzman, M.D., noted Plaintiff's "strength 5/5 in all areas and normal [range of motion] in all areas. Grasp and manipulation intact, SLR negative. Clmts says during the day he can shop, drive, clean [a]nd do laundry. Clmts physical impairments would not impose more than a minimal amount of limitation on his functioning." (Tr. 89). Dr. Hinzman concluded that Plaintiff's physical impairments were "not severe." *Id*.

### a. Mental Functional Limitations

On April 8, 2014, Plaintiff underwent a psychological evaluation performed by consultative examiner Robert F. Dallara, Ph D. (Tr. 368-372). Dr. Dallara opined that Plaintiff would be able to understand and apply instructions in a work setting consistent with low-average intellectual abilities, that there was no direct evidence suggesting an impairment to persistence or pace, and examination suggested that Plaintiff was easily distractible. (Tr. 372). Dr. Dallara indicated that Plaintiff's social presentation was unremarkable during the examination, and he had no information suggesting inappropriate comportment during Plaintiff's work history. *Id*. "However due to his mood issues and anxiety, he may have some problems relating to others including fellow workers and supervisors." *Id*. Finally, again due to anxiety and mood issues, Dr. Dallara opined Plaintiff "may have some difficulties withstanding stress and pressure associated with day-to-day work activity." *Id*.

On April 18, 2014, State Agency psychologist Cynthia Waggoner, Psy. D., found that Plaintiff had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no repeated episodes of decompensation of an extended duration. (Tr. 90-91). She opined that Plaintiff was moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 93). She explained that Plaintiff "can concentrate for extended periods, make simple decisions, and sustain moderate levels of pace, persistence and production." *Id*. She also opined that Plaintiff was moderately limited in his ability to respond appropriately to changes in the work setting and to interact appropriately with the general public, explaining that he can adapt to change in a stable work setting and relate

to coworkers and supervisors on a superficial basis. *Id.* In all other areas, Dr. Waggoner found that either there was no evidence of limitation or that Plaintiff was not significantly limited. (Tr. 92-93, 105-106).

## C. Relevant Hearing Testimony

At the September 29, 2015 hearing, Plaintiff testified as follows:

- He is 5'6" tall and weighs 260 pounds. (Tr. 41).

- He has a driver's license, but does not have a vehicle to drive. (Tr. 42). He has problems driving long distances because his leg falls asleep after an hour. (Tr. 42-43).

- He graduated high school, and has a vocational degree in landscaping. (Tr. 43-44).

- He worked at Giant Eagle as a hot foods clerk. (Tr. 44-45). He lifted boxes as heavy as sixty pounds. (Tr. 46). He injured his back on the job, and was let go in 2012 or 2013. (Tr. 46-48). He had filed a worker's compensation claim. (Tr. 47). After the injury, he could perform the job "[w]ith some difficulty," and it became difficult for him to stand for 8 to 9 hour shifts. (Tr. 47-48).

- He worked for a furniture rental company as an account manager, which also involved making deliveries. (Tr. 48-49). He would lift up to 150 pound televisions with the help of others. (Tr. 50).

- He believes he cannot work due to difficulty standing for long periods of time — even washing dishes for 15 to 20 minutes causes severe pain in his lower back and left calf. (Tr. 52). He also has difficulty sitting for long periods of time, which causes his legs to go numb. *Id.* Lifting a basket of laundry causes lower back pain that shoots down his left leg. *Id.*

- He rated his average daily back pain as a six or seven on a ten-point scale. (Tr. 53).

- He spends a lot of time laying down on his stomach, which helps the pain. (Tr. 54). He also takes muscle relaxers as well as Percocet for pain. The medication makes him numb and lessens the pain enough so he can sleep. (Tr. 55). He also uses a TENS unit four times per week, which helps "a little bit," but does not use it more often to conserve the electro pads. (Tr. 55).

- He suffers from "really bad headaches." (Tr. 56). When they are really severe, he would rate them a six on a ten-point scale. *Id.* He takes medication for the headaches, but still suffers two to three bad headaches per month. *Id.*

- He drinks rarely and does not use illegal narcotics. (Tr. 57). He takes his Percocet as prescribed. (Tr. 57).

- When he checks his email, he spends no more than 15 to 20 minutes on the computer. (Tr. 58).

- In the afternoon, he watches television and takes naps. (Tr. 58). If he feels up to it, he will cook a meal. Otherwise, he eats TV dinners. (Tr. 59). He washes the dishes. *Id*.

- He does not go to the movies, restaurants, or church. (Tr. 59-60). He used to play the drums at church services, but cannot sit through a 30-35 minute service. (Tr. 62). He goes grocery shopping alone twice a week and takes the bus. (Tr. 60).

- He spends most of the day lying in bed and being depressed. (Tr. 61). He takes medication for his depression, which seems to help. (Tr. 61).

- He cannot stand without leaning on something, and can walk up to 0.3 miles, but needs to stop a few times. (Tr. 63). He can stand for 10 to 15 minutes before starting to feel the pain swell up in his back. (Tr. 72). He experiences swelling in his legs and feet almost every day. (Tr. 66).

- He has painful fibroids. (Tr. 64-65). When sitting in a chair, he elevates his legs on a stool. (Tr. 67).

- He no longer reads because he has trouble remembering what he read previously. (Tr. 68).

- He has bad mood swings, and has been convicted of domestic violence. (Tr. 69-70).

- He has trouble staying asleep. (Tr. 71).

- He did not believe he could perform any of his past jobs due to their lifting requirements or the necessity to stand. (Tr. 72).

The VE classified Plaintiff's past relevant work as follows: sales clerk, food, Dictionary of Occupational Titles ("DOT") 290.477-018, light (but medium as performed), semi-skilled with an SBP of 3; furniture rental consultant, DOT 295.357-018, light (but heavy as performed), unskilled with an SVP of 2; and furniture assembler/installer, DOT 739.684-08, heavy, semi-skilled with an SVP of 4. (Tr. 73-75).

The ALJ posed the following hypothetical to the VE:

> Assume a hypothetical individual of the claimant's age, education, and background and with the past jobs that you've described. Further assume this individual is limited to a range of light work with the following additional limitations: No unprotected heights, no moving mechanical parts. This person would also be limited to performing simple, routine, and repetitive tasks but not at a production rate pace. And this person would have occasional contact with supervisors, coworkers, and the public.

(Tr. 75). The VE testified that such an individual could not perform any of Plaintiff's past jobs. *Id*. However, the VE identified the following jobs as representative examples that such an individual could perform: cleaner, housekeeping, DOT 323.687-014, light, unskilled with an SVP of 2 (2,500 jobs locally, 10,000 in Ohio, 500,000 nationally); marker, DOT 209.587-034, light, unskilled with an SVP of 2 (1,000 jobs locally, 4,000 in Ohio, 100,000 nationally); and mail clerk, DOT 209.687-026, light, unskilled with an SVP of 2 (400 jobs locally, 4,000 in Ohio, 100,000 nationally). (Tr. 76-77). He indicated his testimony was consistent with the DOT. (Tr. 77).

The ALJ posed a second hypothetical question to the VE: "Assume that we have the same hypothetical individual, same age, education, and background and limits that I gave you before except that this person is at the sedentary level of exertion." (Tr. 77). Again, the VE testified that such an individual could not perform any of Plaintiff's past jobs. *Id*. However, the VE identified the following jobs as representative examples that such an individual could perform: addresser, DOT 209.587-010, sedentary, unskilled with an SVP of 2 (30,000 jobs nationally); order clerk, food and beverage, DOT 209.567-014, sedentary, unskilled with an SVP of 2 (25,000 jobs nationally); and, film touch-up/inspector, DOT 726.684-050, sedentary, unskilled with an SVP of 2 (40,000 jobs nationally). (Tr. 77-78).

The VE testified that — based on his training, education, experience, knowledge of the

labor market, and consultation with my colleagues — an individual off task 15 percent or more of the work day would be unemployable. (Tr. 78).The VE further testified that employers would tolerate no more than one absence per month. (Tr. 78-79)

Plaintiff's counsel inquired concerning the impact of a sit-stand option on the ALJ's previous hypotheticals—specifically the need to stand and lean on the work surface for 5 to 10 minutes every twenty to thirty minutes. (Tr. 79). The VE testified that such a restriction would eliminate all jobs. (Tr. 79-80). The VE also testified that a requirement of complete isolation from co-workers would be work preclusive. (Tr. 80-81).

### III. Disability Standard

A claimant is entitled to receive benefits under the Social Security Act when he establishes disability within the meaning of the Act. 20 C.F.R. § 404.1505 & 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); 404.1509 and 416.909(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. § 404.1520(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he/she seeks disability benefits. 20 C.F.R. §§ 404.1520(b) and 416.920(b). Second, the claimant must show that he suffers from a medically determinable "severe impairment" or combination of impairments in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c). A "severe impairment" is one that "significantly limits

13

... physical or mental ability to do basic work activities." *Abbott*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment (or combination of impairments) that is expected to last for at least twelve months, and the impairment(s) meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d). Fourth, if the claimant's impairment(s) does not prevent him/her from doing past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment(s) does prevent him/her from doing past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g) and 416.920(g), 404.1560(c).

### IV. Summary of the ALJ's Decision

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act (the "Act") through December 31, 2015.

2. The claimant has not engaged in substantial gainful activity since October 31, 2012, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3. The claimant has the following severe impairments: neurofibromatosis, degenerative disc disease of the lumbar spine, obesity, depression, bipolar disorder and post-traumatic stress disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that the claimant must avoid all exposure to workplace hazards, including unprotected heights and

14

dangerous moving machinery; the claimant is limited to the performance of simple, routine, repetitive tasks, undertaken in a work setting free of production rate pace [as is found in assembly line work], which setting requires no contact with the public and no more than occasional contact with co-workers and supervisors.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on May 3, 1974 and was 38 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from October 31, 2012, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 30).

## V. Law and Analysis

### A. Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look

into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. (*Id.*) However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

**B.  Plaintiff's Assignments of Error**

**1. Credibility Assessment**

In his second assignment of error, Plaintiff contends that the ALJ erred in the assessment of his credibility. According to SSR 96-7p, 1996 WL 374186 (July 2, 1996) (as well as SSR 16-3p), evaluating an individual's alleged symptoms entails a two-step process. First, an ALJ must determine whether a claimant has a "medically determinable impairment" that could reasonably produce a claimant's alleged symptoms.[4] *Id.* at *2. The ALJ's decision clearly found the first step was satisfied and states that Plaintiff's impairments "could reasonably be expected to produce some of the symptoms he has alleged." (Tr. 23). Once step one is satisfied, when

---

[4] SSR 16-3p supercedes SSR 96-7p, 1996 WL 374186 (July 2, 1996), which was in effect at the time of the September 29, 2015, hearing. Plaintiff does not aver which of the two rulings apply. While there is not unanimity on the issue, the court declines to apply SSR 16-3p retroactively.

considering the intensity, persistence, and limiting effects of an individual's symptoms," an ALJ should consider the following seven factors: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, an individual receives or has received for relief of pain or other symptoms; (6) any measures, other than treatment, an individual uses or has used to relieve pain or other symptoms; and, (7) any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms. SSR 96-7p at *3.

However, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003); *accord Sorrell v. Comm'r of Soc. Sec.*, 656 Fed. App'x 162, 173 (6th Cir. 2016). "[C]redibility determinations with respect to subjective complaints of pain rest with the ALJ." *Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Villarreal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987) ("[T]olerance of pain is a highly individual matter and a determination of disability based on pain by necessity depends largely on the credibility of the claimant," and an ALJ's credibility finding "should not lightly be discarded.")(citations omitted).

Nevertheless, while an ALJ's credibility determinations concerning a claimant's subjective complaints are left to his or her sound discretion, those determinations must be reasonable and supported by evidence in the case record. *See, e.g., Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007); *Weaver v. Sec'y of Health & Human Servs.*, 722 F.2d 310, 312 (6th Cir. 1983) ("the ALJ must cite *some* other evidence for denying a claim for pain in addition to

17

personal observation"). "It is not sufficient for the adjudicator to make a single, conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'" SSR 96-7p, 1996 WL 374186 at *2.[5] Rather, an ALJ's "decision must contain *specific reasons* for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight. *Id*. at *2. "While in theory [a court] will not 'disturb' an ALJ's credibility determination without a 'compelling reason,' *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001), in practice ALJ credibility findings have become essentially 'unchallengeable.'" *Hernandez v. Comm'r of Soc. Sec.*, 644 Fed. App'x 468, 476 (6th Cir. 2016) (*citing Payne v. Comm'r of Soc. Sec.*, 402 Fed. App'x 109, 113 (6th Cir. 2010)).

Here, the ALJ expressly acknowledged he must follow a two-step process to determine whether Plaintiff's symptoms were credible. (Tr. 24). Plaintiff points to his testimony that he cannot stand without leaning or for longer than 15-20 minutes, cannot walk more than 1/3 of a mile and even that requires rest breaks, has difficulty sitting, has back pain which he rates a six or seven on a ten-point scale, has bad headaches and migraines two to three times per month, and needs to elevate his legs when sitting. (R. 13, PageID# 681). Plaintiff contends the ALJ "ignored" this testimony.[6] *Id*. Conversely, the Commissioner asserts that the ALJ conducted a proper credibility analysis, and did not err by failing to address every piece of evidence or

---

[5] SSR 16-3p merely replaced the term "credible" in this sentence with the terms "supported or consistent." 2016 WL 1119029 at *9.

[6] Notably, Plaintiff's challenge to the ALJ's credibility analysis does not involve any symptoms or limitations stemming from his mental impairments. (R. 13, PageID# 681).

testimony explicitly. (R. 15, PageID# 702-703).

Contrary to Plaintiff's assertion that the ALJ failed to consider his alleged symptoms and ensuing limitations, the ALJ specifically summarized them as follows: "The claimant alleges chronic, achy and throbbing mid-back to low-back pain, radiating to this left calf, causing deficits of his ability to squat, bend, lift, stand, walk, sit or kneel …." (Tr. 24). Therefore, the ALJ, in general but clear terms, identified the source of Plaintiff's alleged pain and the limitations allegedly caused by said symptoms.[7] The ALJ went on to address the credibility of these allegations as follows:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.
>
> * * *
>
> Relevant to the claimant alleged neurofibromatosis and degenerative disc disease of the lumbar spine, the claimant was diagnosed with neurofibromatosis on March 27, 2008 (2F/3), and x-ray examination dated January 15, 2015 indicated degenerative changes to the lumbar spine (13F/4). While these findings would be consistent with the claimant's allegations of mid-back to low-back pain (2A/6), "aching and throbbing" in nature and descending to his left calf (l5F/2), the record, when considered as a whole, is not supportive of the contention that the existence of this impairment would be preclusive of all types of work.
>
> X-ray examination of the claimant's lumbar spine, dated January 15, 2015, indicated "minimal" degenerative changes (13F/4). Diagnostic imaging of the lumbar spine, dated December 18, 2014, indicated findings consistent with the

---

[7] The ALJ specifically noted Plaintiff's alleged deficits in his ability to stand, and explained in the quoted portion of the decision why he believed such allegations were not fully credible. (Tr. 24-25). While the ALJ did not separately discuss Plaintiff's alleged need to lean against something while standing, such a limitation would plainly fall under the general rubric of standing limitations. As noted below, an ALJ need not discuss each piece of evidence or every allegation individually when passing on a claimant's credibility. By addressing alleged standing limitations in general terms, the ALJ implicitly passed on the credibility of Plaintiff's alleged need to lean while standing.

claimant's history of neurofibromatosis, but no stenosis at any level of the lumbar spine, findings stable since 2012 (13F/15-16).

The claimant was assessed by a neurosurgeon on May 5, 2015 as a non-surgical candidate (15F/2) and his pain management treating source noted on August 3, 2015, that the claimant had no lesions affecting his spinal cord or nerve roots (17F/3).

Physical examinations included in the record have consistently, albeit not universally, reported either minimal or normal findings, including one dated March 26, 2014, which indicated skin nodules in the back and right wrist, but non-tender, with negative straight leg raising, a normal gait, normal sensation, strength, range of motion of the lumbar spine and all extremities (8F/6), one dated November 21, 2014, which indicated a normal range of motion of all extremities, with no tenderness to palpation, and no motor or sensory deficits (13F/20), or one dated April 10, 2015, which indicated an antalgic gait and periodic "give away" weakness of the legs, but otherwise normal strength, symmetrical reflexes, normal coordination, normal sensation and no spasms (18F/5).

The claimant follows a regimen of prescription medications intended to address these impairments, which have been effective (15F/3).

The claimant has reported some effectiveness of a non-medicinal palliative, specifically a transcutaneous electrical nerve stimulator (3E/7).

However, the claimant has not discernibly followed any other course of treatment, whether conservative in nature, such as a course of physical therapy, or more invasive, such as a course of injection therapy.

In sum, the evidence would indicate that the symptom limitations relevant to this impairment are not as severe as alleged. In a setting where the claimant would be restricted to work at the light exertional level, and would avoid all exposure to workplace hazards, including unprotected heights and dangerous moving machinery, adequate allowance will have been made for these impairments.

(Tr. 24-25).

The above cited passage reveals that the ALJ discussed several of the seven factors for finding Plaintiff less than fully credible. In addition to the objective medical evidence of record, the ALJ discussed effectiveness of Plaintiff's pain medications, other treatment such as Plaintiff's use of a TENS unit, and the conservative nature of Plaintiff's treatment in general and

the lack of more invasive treatment such as surgery, pain injections, or even physical therapy. (Tr. 24). Later in the decision, the ALJ also noted Plaintiff's daily activities, which included the performance of chores, using public transportation, and going on an outing to Cedar Point amusement park. (Tr. 26-27). An ALJ is not required to analyze all seven factors, but should consider the relevant evidence. *See, e.g., Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005) (Baughman, M.J.) ("The ALJ need not analyze all seven factors identified in the regulation but should provide enough assessment to assure a reviewing court that he or she considered all relevant evidence"); *Masch v. Barnhart*, 406 F. Supp.2d 1038, 1046 (E.D. Wis. 2005) (finding that neither SSR 96-7p nor the regulations "require the ALJ to analyze and elaborate on each of the seven factors when making a credibility determination"); *Wolfe v. Colvin*, No. 4:15-CV-01819, 2016 WL 2736179 at *10 (N.D. Ohio May 11, 2016) (Vecchiarelli, M.J.); *Allen v. Astrue*, No. 5:11CV1095, 2012 WL 1142480, at *9 (N.D. Ohio Apr. 4, 2012) (White, M.J.).

As noted above, Plaintiff suggests the ALJ "ignored" statements he made during the hearing that were inconsistent with the RFC. (R. 13, PageID# 681). However, Plaintiff cites no authority suggesting that an ALJ's credibility analysis must specifically enumerate each and every alleged piece of evidence or conduct a symptom-by-symptom analysis. *Id*. "There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record." *Whitford v. Comm'r of Soc. Sec.*, No. 12-14761, 2014 WL 540008 at *2 (E.D. Mich. Feb. 11, 2014) (*citing Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 508 (6th Cir.2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party")). "Further, this Court does 'not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility.'" *Id. (citing Bass v.*

*McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). Plaintiff's brief fails to argue that the credibility analysis did not comport with the above law. To the extent Plaintiff invites the court to construe his testimony in a more favorable light or to conduct its own credibility analysis, such an argument does not provide a basis for remand.

The ALJ's credibility discussion adequately comported with the regulations and SSR 96-7p. Thus, Plaintiff's second assignment of error is without merit.

**2. Step Three Finding and RFC determination.**

In the first assignment of error, Plaintiff asserts that "the ALJ did not properly evaluate [his] neurofibromatosis and psychiatric impairments at Step Three of the sequential evaluation." (R. 13, PageID# 676).

Plaintiff's argument is not entirely clear from the brief. "Under step three, a claimant must show that her severe impairments qualify under the listings…." *Courter v. Comm'r of Soc. Sec.*, 479 Fed. Appx. 713, 720 (6th Cir. 2012); *Bowman v. Comm'r of Soc. Sec.*, 683 Fed. Appx. 367, 2017 WL 1065553 (6th Cir. 2017) ("At step three, the ALJ determines whether the claimant automatically qualifies for benefits because his impairments match the criteria for a listed disability.") Furthermore, "[w]hen a claimant alleges his impairments meet or equal a listed impairment, *he must present specific medical findings to satisfy the criteria of the particular listing*." *Bowman*, 683 Fed. Appx. 367 (*citing* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1526)).

Here, Plaintiff's brief on the merits does not identify which listing he allegedly met at Step Three, nor does he set forth the "specific medical findings" that would satisfy the criteria of the unidentified listing. Therefore, to the extent Plaintiff challenges the ALJ's determination that he did not meet or medically equal a listed impairment, the court considers such an argument waived. Plaintiff's brief presents no evidence or argument supporting his conclusory statement

that the Step Three determination was erroneous, and the court rejects it. *See. e.g., Kennedy v. Commissioner*, No. 03-1276, 2003 WL 23140056, at *1 (6th Cir. Dec. 12, 2003) (*citing United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996)) (rejecting perfunctory argument); *McPherson v. Kelsey*, 125 F.3d 989, 995-996 (6th Cir. 1997), *cert. denied*, 523 U.S. 1050 (1998) (same); *McClellan v. Astrue*, 804 F. Supp.2d 678, 688 (E.D. Tenn. 2011) (court under no obligation to scour record for errors not identified by claimant). The *McPherson* court aptly stated: "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson*, 125 F.3d at 995-996 (internal citations omitted).

Plaintiff does, however, appear to argue that his physical and mental impairments should have resulted in a more restrictive RFC. For example, Plaintiff contends that his own testimony and symptoms noted by his physicians do not support a finding that he is capable of light exertional work level as determined by the ALJ. (R. 13, PageID# 677). Therefore, despite purporting to raise a Step Three argument, the court construes Plaintiff as arguing that the RFC was unsupported by substantial evidence.

The RFC is an indication of an individual's work related abilities *despite* their limitations. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a).[8] The ALJ bears the responsibility for assessing a

---

[8] Moreover, a claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner, and "[i]f the treating physician instead submits an opinion on an issue reserved to the Commissioner—such as whether the claimant is disabled, unable to work, *the claimant's RFC*, or the application of vocational factors—his decision need only 'explain the consideration given to the treating source's opinion." *Curler v. Comm'r of Soc. Sec.*, 561 Fed. App'x 464, 471 (6th Cir. 2014) (emphasis added) (*quoting Johnson v. Comm'r of Soc. Sec.*, 535 Fed. Appx. 498, 505 (6th Cir. 2013) (internal citations omitted)).

claimant's RFC. *See* 20 C.F.R. §§ 404.1546(c), 416.945(c).

Plaintiff contends the ALJ did not consider the results of a December 2014 MRI when determining his RFC. (R. 13, PageID# 676). Plaintiff's statement is wholly inaccurate. The decision states that "[d]iagnostic imaging of the lumbar spine, dated December 18, 2014, indicated findings consistent with the claimant's history of neurofibromatosis, but no stenosis at any level of the lumbar spine, findings stable since 2012 (13F/15-16)." (Tr. 25). Moreover, as stated above, "[t]here is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record." *Whitford*, 2014 WL 540008 at *2.

Finally, Plaintiff directs the court to multiple pieces of evidence in the record that he apparently believes would necessitate greater restrictions in the RFC. Even if the court were to assume—for the sake of argument only—that these references to the record *could* justify a more restrictive RFC, a claimant does not establish a lack of substantial evidence merely by pointing to evidence of record that supports his position. "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Thomas v. Astrue*, No. 1:10-CV-1777, 2011 WL 4496533 at *6 (N.D. Ohio Sept. 27, 2011) (White, M.J.) (*quoting Buxton v. Halter*, 246 F.3d 762, 772-773 (6th Cir. 2001)); *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) (same); *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984) ("The substantial-evidence standard allows considerable latitude to administrative decision makers. It presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts."); *accord Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (same).

Therefore, Plaintiff must demonstrate that there is insufficient evidence in the record to allow a reasoning mind to accept the ALJ's RFC determination. The ALJ's physical RFC

determination—that Plaintiff can perform light exertional work with a few additional environmental restrictions—is supported by the 2014 opinion of Dr. Amanambu, who opined Plaintiff could perform light exertional work. (Tr. 28, 366). The ALJ's mental RFC determination—that Plaintiff can perform simple, routine, repetitive tasks, undertaken in a work setting free of production rate pace, and requiring no contact with the public and no more than occasional contact with co-workers and supervisors—is supported by the 2014 opinion from Dr. Dallara and Dr. Waggoner. (Tr. 27-28, 92-93, 105-106, 368-372). Furthermore, Plaintiff points to no medical source opinions suggesting a greater RFC was required. Instead, Plaintiff would have the court overrule these medical source opinions based on its own review of the medical records.[9] This court's review, however, does not encompass a *de novo* review, resolving conflicts in the medical evidence, or deciding questions of credibility. *Nelson v. Comm'r of Soc. Sec.*, 195 Fed. App'x 462, 468 (6th Cir. 2006); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *accord Rogers v. Astrue*, 2012 WL 639473 at *3 (E.D. Ky. Feb. 27, 2012).

Plaintiff has failed to draw this Court's attention to any actual deficiency in the ALJ's RFC determination, and there is substantial evidence to support the RFC. As such, Green's argument is without merit.

### 3. Step Five Finding

In his third and final assignment of error, Green asserts that the ALJ erred at Step Five of the sequential evaluation. (R. 13, PageID# 682-682). At the fifth and final step of the disability analysis, if a claimant cannot perform his past relevant work, it must be determined whether the

---

[9]  Plaintiff suggests Dr. Dallara's opinion was inconsistent with a number of notations in counseling records. (R. 13, PageID# 678). Again, the mere presence of conflicting evidence does not render a decision devoid of substantial evidence.

claimant can make an adjustment to other work in light of the claimant's RFC, age, education, and past work experience. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At this final step, the burden shifts to the Commissioner to prove the existence of a significant number of jobs in the national economy that a person with the claimant's limitations could perform. *Her*, 203 F.3d at 391; *accord White v. Comm'r of Soc. Sec.*, 312 Fed. App'x 779 (6th Cir. 2009). An ALJ's finding in this regard must be supported by substantial evidence (*i.e.* that the claimant has the vocational qualifications to perform specific jobs). *Workman v. Comm'r of Soc. Sec.*, 105 Fed. App'x 794, 799 (6th Cir. 2004) (*citing Varley v. Sec'y of Health & Varley*, 820 F.2d 777, 779 (6th Cir. 1987)).

Testimony from a vocational expert—in response to a hypothetical question—may constitute substantial evidence that a claimant retains the ability to perform specific jobs, so long as the hypothetical question accurately accounts for a claimant's physical and mental impairments. *See, e.g., Pasco v. Comm'r of Soc. Sec.*, 137 Fed. App'x 828, 845 (6th Cir. 2005) (*citing Varley*, 820 F.2d at 779)). However, "[t]he rule that a hypothetical question must incorporate all of the claimant's physical and mental limitations does not divest the ALJ of his or her obligation to assess credibility and determine the facts." *Griffeth v. Comm'r of Soc. Sec.*, 217 Fed. App'x 425, 429 (6th Cir. 2007) (*quoting Redfield v. Comm'r of Soc. Sec.*, 366 F. Supp.2d 489, 497 (E.D. Mich. 2005)). In other words, when an ALJ presents hypothetical question(s) to the VE, the ALJ is required to incorporate only those limitations that have been accepted as credible. *Griffeth*, 217 Fed. App'x at 429 (*citing Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).

Plaintiff's argument appears to be founded on his first two assignments of error—that the ALJ should have crafted a more restrictive RFC and given more credit to his testimony. As

26

discussed above, the ALJ did not find Plaintiff credible and there was no error in his credibility determination. The ALJ's RFC determination was also based on substantial evidence. As such, the ALJ was not obligated to include limitations that had been rejected. Because Plaintiff has not identified any inaccuracy in the hypothetical question with respect to those limitations that the ALJ actually credited, the ALJ could reasonably rely on the VE's testimony. Plaintiff's final assignment of error is without merit.

## IV. Conclusion

For the foregoing reasons, it is recommended that the Commissioner's final decision be AFFIRMED.

s/ *David A. Ruiz*
David A. Ruiz
United States Magistrate Judge

Date: October 10, 2017

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the district court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985),** *reh'g denied***, 474 U.S. 1111 (1986).**